[Cite as *State ex rel. Newsome v. Indus. Comm.*, 2014-Ohio-1643.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Michael Newsome, | : | |
| Relator, | : | |
| v. | : | No. 13AP-453 |
| Industrial Commission of Ohio and | : | (REGULAR CALENDAR) |
| Berardi Enterprises, Inc., Holly Sales of Northern Ohio, | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on April 17, 2014

*Plevin & Gallucci, Frank Gallucci, III*, and *Bradley E. Elzeer, II; Paul W. Flowers Co., L.P.A.*, and *Paul W. Flowers*, for relator.

*Michael DeWine,* Attorney General, and *Kevin J. Reis,* for respondent Industrial Commission of Ohio.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

CONNOR, J.

{¶ 1} Relator, Michael Newsome, brings this original action seeking a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order declaring an overpayment of temporary total disability compensation to relator for the period of December 26, 2006, through November 21, 2008, and finding that the overpayment should be collected pursuant to the fraud provisions of R.C. 4123.511(K)(4).

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to a magistrate who rendered a decision and recommendation that includes findings of fact and conclusions of law, which is appended hereto. The magistrate concluded that an affidavit of John Gillota Junior (a.k.a. John

Gillota, III), provided some evidence upon which the commission could rely in support of its order.[1]

{¶ 3}   In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.,* 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986).

{¶ 4}   As a preliminary matter, we disagree with the position taken by the Bureau of Workers' Compensation ("BWC") that Gillota's prior statements to investigators are consistent with his affidavit.  Gillotta's affidavit clearly implicates relator in a scheme designed to conceal earnings for work he performed for Gillotta's company by "brokering" payments through relator's wife. (Gillota affidavit, ¶ 3.) By contrast, Gillotta's statements to investigators are ambiguous.

{¶ 5}   In each of his objections, relator argues for a slightly different reason, that Gillota's affidavit should not have been considered by the commission inasmuch as his previous statements to investigators contradict his affidavit and because Gillotta repeatedly refused to appear and give testimony pursuant to a lawfully issued subpoena. Relator maintains that the commission essentially prevented him from exercising his constitutional right to confront witnesses against him and that the commission's reliance upon Gillota's unchallenged affidavit violates due process.

{¶ 6}   There is no question that the material inconsistency between Gillotta's affidavit and his prior statements to investigators raise serious doubts about the truth of his averments.[2] However, as the magistrate noted, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981). Here, the magistrate

---

[1] The affidavit consists of Gillota's short responses to several written questions posed by the Attorney General.

[2] In civil actions, "[a]n affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat a motion for summary judgment." *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, ¶ 28. Similarly, "where a medical expert has, by deposition testimony, repudiated a conclusion previously made in a medical report, that report cannot constitute evidence to support the order of the commission." *State ex rel. Jennings v. Indus. Comm.*, 1 Ohio St.3d 101 (1982).

determined that relator's only recourse, under the circumstances, was to ask the commission to bring a contempt action against Gillota pursuant to R.C. 4123.12. R.C. 4123.12 provides as follows:

> In case any person fails to comply with an order of the industrial commission or subpoena issued by the commission or its secretary or the bureau of workers' compensation, or any of their inspectors, or examiners, or on the refusal of a witness to testify to any matter regarding which he may be lawfully interrogated, or if any person refuses to permit an inspection, the probate judge of the county in which the person resides, *on application of any member of the commission or its secretary or the bureau, or any inspector, or examiner appointed by the bureau,* shall compel obedience by attachment proceedings as for contempt, as in the case of disobedience of the requirements of subpoena issued from such court on a refusal to testify therein.

(Emphasis added.)

{¶ 7} Under the statutory scheme, a claimant does not have the authority to initiate contempt proceedings against a recalcitrant witness. Nevertheless, the magistrate faulted relator for failing to take the steps necessary to secure Gillota's attendance at the hearing:

> When Gillota refused to attend the hearing, relator's counsel could have, but did not, ask the commission to institute contempt proceedings with the probate judge of the county in which Gillota resides. Counsel could have taken this step; however, counsel did not. A writ of mandamus is not appropriate when the requesting party has not availed himself of other available legal remedies. Instead, counsel wants this court to remove Gillota's affidavit from evidentiary consideration and order the commission to vacate its order. It is this magistrate's opinion that this court should not take that step.

(Magistrate's decision, 21-22.)

{¶ 8} In his objections, relator denies any culpability arguing that the commission asked BWC to secure Gillota's attendance at the hearing. The stipulated record substantiates relator's claim.

{¶ 9} In proceedings before the commission on October 16, 2012, the following discussion took place:

MR. SANDERS: Sure. Thank you. And I guess I have a procedural matter to bring forth. I realize that it was Mr. Elzeer that requested the Industrial Commission to issue a subpoena to have Mr. - - and I'm not sure how to pronounce it - - Gillota, Gillota, present as a witness. Quite frankly, he beat us to it because we were also going to request the Commission to issue a subpoena. But I saw no need to do it a second time when I saw it had been done the first time.

Obviously, as you can tell, whether or not you believe our case or whether or not you believe the defense on behalf of Mr. Newsom, the real piece of crucial evidence here would be either the statements or the testimony of Mr. Gillota, who has obviously ignored the subpoena, apparently, and is not present.

I just want to present for the Commission whether or not based on, assuming that you've reviewed the file and you see what our case is, that you feel it's mandatory for one more effort to try or, Mr. Elzeer, I don't know how he feels about it since he subpoenaed Mr. Gillota, to try and have Mr. Gillota actually present to explain or testify as to what happened in this case. I'm perfectly content to go forward, I just wanted to bring it to your attention and see what Mr. Elzeer wanted to do about it.

MR. ELZEER: We subpoenaed him on all three occasions and he's ignored all three subpoenas. It would be nice to have him here.

HEARING OFFICER GILLMOR: We're going to take this under advisement and step in the back for a few minutes.

MR. SANDERS: Okay.

(A recess is taken.)

HEARING OFFICER GILLMOR: The Commission would like to grant a continuance in this instance. *And we are going to request that we issue a subpoena since everyone wants to have the witness here and his testimony is important. And we will put in our order that both sides would like to have that witness here, and it will be enforced by the Attorney General.*

MR. SANDERS: Thank you.

> HEARING OFFICER GILLMOR: That's what we're going to ask for. That's what we're going to ask for.
>
> MR. SANDERS: Okay. Appreciate that.
>
> HEARING OFFICER GILLMOR: Whether the Attorney General will do that or not, we don't know at this point, but that's what we're going to ask for.

(Stip.R., 395-97.) (Emphasis added.)

{¶ 10} Although BWC had expressed its willingness to go forward without Gillotta's testimony, given the acknowledged credibility issues surrounding Gillota's affidavit, the commission elected not to proceed in his absence. It is clear then that the commission considered Gillotta to be a crucial witness in the case and that his attendance was indispensable. It is also clear from the transcript that the commission expected that Gillota's subpoena would "be enforced by the Attorney General." (Stip.R., 397.)

{¶ 11} In our opinion, the commission acted unreasonably when it subsequently permitted the BWC to rest upon Gillotta's affidavit. Under the circumstances, Gillotta's affidavit does not qualify as "some evidence" upon which the commission could rely in support of its order. Inasmuch as the commission expressly relied upon Gillota's affidavit, the commission abused its discretion when it determined that relator committed fraud. Accordingly, relator's objections are sustained.

{¶ 12} Following an independent review pursuant to Civ.R. 53, we find that the magistrate has properly determined the pertinent facts, and we adopt them as our own. However, for the reasons set forth in this decision, we reject the magistrate's conclusions of law and issue a writ of mandamus that orders the commission to: (1) vacate its order declaring an overpayment of temporary total disability compensation paid to relator for the period of December 26, 2006 through November 21, 2008, and finding that the overpayment should be collected pursuant to the fraud provisions of R.C. 4123.511(K)(4); (2) issue a new order striking the affidavit of John Gillota Junior (a.k.a. John Gillota, III); and (3) conduct a hearing to re-determine the fraud claim based upon the evidence in the stipulated record and any other evidence presented at the hearing.

*Objections sustained; writ of mandamus granted.*

KLATT and TYACK JJ., concur.

_____

# A P P E N D I X

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

State ex rel.                                          :
Michael Newsom,

                                                      :

        Relator,

                                                      :

v.                                                         No. 13AP-453

                                                      :

Industrial Commission of Ohio                           (REGULAR CALENDAR)
and Berardi Enterprises Inc.,                         :
Holly Sales of Northern Ohio,

                                                      :

        Respondents.

                                                      :

---

## M A G I S T R A T E ' S   D E C I S I O N

### Rendered on November 25, 2013

---

*Plevin & Gallucci, Frank Gallucci, III,* **and** *Bradley E. Elzer, II; Paul W. Flowers Co., L.P.A.,* **and** *Paul W. Flowers,* **for relator.**

*Michael DeWine,* **Attorney General, and** *Kevin J. Reis,* **for respondent Industrial Commission of Ohio.**

---

### IN MANDAMUS

{¶ 13} Relator, Michael Newsom, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order which found that relator had been overpaid temporary total disability ("TTD") compensation and further made a finding of fraud and ordering the commission to find that the Ohio Bureau of Workers' Compensation ("BWC") did not meet its burden of proving the overpayment or fraud.

Findings of Fact:

{¶ 14} 1. Relator sustained a work-related injury on April 17, 1991, and his workers' compensation claim has been allowed for the following:

> Lumbosacral strain; herniated disc at L5-S1 on left; lumbar radiculopathy; failed back surgery syndrome; neurogenic bladder; recurrent herniated L5-S1 disc; aggravation of pre-existing degenerative disc disease at L4 through S1; L4-5 disc bulge; depressive psychosis moderate.

{¶ 15} 2. Relator received closed periods of TTD compensation in 1995, from November 1999 through January 2000, and again in 2004 through November 2008.

{¶ 16} 3. Sometime after 2000, while TTD compensation was not being paid, relator operated a gas station which he leased from Gillota, Inc.

{¶ 17} 4. In 2008, the BWC received information indicating that relator was working while receiving TTD compensation. The Special Investigations Department began an investigation. As part of the investigation, the following interviews were conducted: (a) On December 22, 2008, Special Agents A. Cronig and J. Burke interviewed John Gillota, Jr. (aka John Gillota, III)[3]. The memorandum of interview provides the following relevant information:

> Cronig asked [Gillota] how he met NEWSOM. [Gillota] stated he met NEWSOM through NEWSOM's brother, Bill Newsom.
>
> After being asked, [Gillota] stated he had never employed NEWSOM and that NEWSOM just leased the gas station.
>
> * * *
>
> The interview was then discontinued when a ceiling sprinkler system pipe broke.

(b) On January 16, 2009, Special Agents Cronig and M. Lang interviewed Gillota. The following relevant information was obtained during this interview: att. 5

> Cronig asked [Gillota] when he first met NEWSOM. [Gillota] stated he met NEWSOM during late 2001 or early 2002.
>
> * * *

---

[3] The investigation report refers to a John Gillota, Jr. and a John Gillota III. At oral argument the magistrate asked if they were different people and was told that they are one and the same. As such, the magistrate will refer to this person as "Gillota."

Cronig asked [Gillota] why the lease was terminated during November 2005. [Gillota] stated NEWSOM couldn't make the lease payments and NEWSOM voluntarily elected to leave the gas station (ending the lease).

* * *

Cronig asked [Gillota] what type of work NEWSOM had performed for [Gillota] in order for NEWSOM to repay the debt. [Gillota] stated NEWSOM hasn't performed any work in order for NEWSOM to repay the debt.

Cronig asked [Gillota] how he would agree with NEWSOM how much money is deducted from NEWSOM's debt when NEWSOM would work for [Gillota]. [Gillota] stated the question didn't apply because NEWSOM didn't work for [Gillota].

* * *

Cronig asked [Gillota] how payroll is made at Gillota. [Gillota] stated payroll is made at Gillota by both himself and with Sr. reviewing time cards.

In addition, Cronig asked [Gillota] if checks were ever written in someone else's name for work performed by NEWSOM. After Cronig asked the question, Rodio advised [Gillota] not to answer the question and then asked Cronig and Lang to leave the room. After several minutes, Cronig and Lang were asked to return to the room. [Gillota] then stated NEWSOM was not an employee.

Continuing, Cronig asked [Gillota] is [sic] he had done anything to conceal NEWSOM's employment. [Gillota] stated he had not done anything to conceal NEWSOM's employment.

Cronig showed [Gillota] a color BMV photo of Tammie A. Newsom (Tammie).

Cronig asked [Gillota] who was Tammie. [Gillota] stated Tammie was NEWSOM's wife. [Gillota] was also asked what Tammie did. [Gillota] stated for the businesses (Gillota), Tammie didn't do anything. In addition, [Gillota] was asked how long Tammie has worked for [Gillota]. [Gillota] stated [she] didn't work for the businesses (Gillota).

[Gillota] was asked if it were true that checks written for Tammie were actually work NEWSOM's work with [Gillota]. [Gillota] stated "no". Rodio then stated Tammie was a 1099 person. [Gillota] then stated Tammie furnished the labor. Cronig then asked for the names of the persons which were furnished for labor. Rodio then stated he would not allow [Gillota] to provide the names of the persons which were furnished for labor. [Gillota] then stated he was not aware of NEWSOM having any problems with BWC.

* * *

[Gillota] was asked if he knew of any of NEWSOM's friends or relatives and if any of them are or where [sic] employees. [Gillota] stated Tammie was a contractor with Gillota but [Gillota] didn't remember the beginning and ending dates.

Cron[i]g asked [Gillota] where else NEWSOM worked besides Gillota. [Gillota] stated other than working for Tammie during the last two to three years, [Gillota] is not aware of any other employment for NEWSOM.

* * *

Cronig asked [Gillota] to complete a written statement of topics covered during the interview. [Gillota] then declined to complete a written statement of topics covered during the interview. Cronig was advised that [Gillota] was looking for NEWSOM's and Tammie's file and that a letter might also be completed.

Finally, the interview was concluded with Cronig being advised of information regarding a shooting which took place during 2005, at the Marathon gas station NEWSOM leased (Michael Ferrell, Cuyahoga County civil case no. 05-604519).

(c) On June 8, 2009, Special Agents Cronig and Lang interviewed Carol A. Rollo, who had been a secretary with Gillota, Inc. for 22 years. After identifying a picture of Tammie Newsom, Rollo replied:

"This person looks familiar, but don't know her name." "I don't think she was an employee or contractor with Gillota, Inc."

The following other relevant information was obtained during the interview:

Cronig asked Rollo what business relationship Tammie had with Gillota, Incorporated. Rollo stated she did not believe

Tammie had a business relationship with Gillota, Incorporated.

Cronig asked Rollo specifically what Tammie did or service she performed with Gillota, Incorporated. Rollo stated with the previous 22 years, Tammie has not been an employee or contractor with Gillota, Incorporated. Also, Rollo stated Rollo has completed payroll taxes and W2's for Gillota, Incorporated, employees for the past 8 or 9 years; completed 1099's possibly during 2002, 2003, 2004, 2005, and 2006; completed Workers' Compensation returns twice a year and completed ODJFS reports quarterly.

Tammie has not been an employee or contractor with Gillota, Incorporated, for the last 22 years.

Cronig asked Rollo if she would be surprised that Tammie earned $22,817.00, during 2007, and $10,912.00, during 2008, from Gillota, Incorporated. Rollo stated she was surprised about the earnings because she had never observed Tammie or Tammie's name at Gillota, Incorporated.

Cronig showed Rollo a color copy of NEWSOM's driver's license photo. Cronig then asked Rollo to identify the photo. Rollo stated the photo was of Mike Newsom. Rollo then wrote "This is Mike Newsome been called in a couple of times to work on trucks over a couple years". "I don't know what else he does for Gillota" on the photo and then verified this by placing her initials, date and time on the document.

* * *

Cronig asked Rollo what business relationship NEWSOM had with Gillota, Incorporated. Rollo stated she was not currently aware of any business relationship NEWSOM had with Gillota, Incorporated.

Rollo stated NEWSOM was called in several times over the years to work on the Gillota, Incorporated, trucks, and NEWSOM used to run the gas station located at East 152nd Street & St. Clair Avenue.

Cronig asked Rollo what time frame NEWSOM performed services with Gillota, Incorporated. Rollo stated she had no knowledge of NEWSOM working the parking lots shuttling people.

Rollo stated she did not know NEWSOM's job duties.

Cronig asked Rollo when NEWSOM worked. Rollo stated she didn't know when NEWSOM worked.

Rollo stated NEWSOM didn't work for Gillota, Incorporated.

* * *

Rollo answered "I don't know" to the following questions that Cronig asked:

Isn't it true checks written to Tammie were actually for NEWSOM's work?

Is there a contract between Gillota, Incorporated, and Tammie or NEWSOM?

Who were the people Tammie assigned to work at Gillota, Incorporated?

What did these people do at Gillota, Incorporated?

What are the exact work dates at Gillota, Incorporated?

Where are the bills or invoices that were submitted to Gillota, Incorporated, for payment made to Tammie?

How did Gillota, Incorporated, and/or the bookkeeper know how much to pay Tammie?
When did the agreement with Tammie and/or NEWSOM begin?
How did this arrangement come about to have Tammie receive 1099's and then have someone else show up at Gillota, Incorporated?

Did Tammie ever work at Gillota, Incorporated, or was it someone else?

Who else was present during the period of time NEWSOM was present at Gillota, Incorporated?

When was the last time Tammie or NEWSOM worked for Gillota, Incorporated?

What is Tammie's occupation outside of Gillota, Incorporated?

> Would NEWSOM's work days mirror that of the Cleveland Indians home games during the 2007 and 2008 baseball season?

(d) On June 16, 2009, Special Agents Cronig and Lang interviewed Charles E. Etheridge, a full-time sales manager with Gillota, Inc. since 1993. Etheridge provided the following relevant information during the interview:

> Cronig asked Etheridge when he first met Tammie. Etheridge stated he knew Mrs. Newsom from her husband's leasing of a Gillota gas station, located at East 152nd Street & St. Clair Avenue.
>
> Continuing, Cronig asked Etheridge what business relationship Tammie had with Gillota. Etheridge responded by stating Tammie was the wife of the lessee (NEWSOM).
>
> Cronig asked Etheridge specifically what Tammie did or service she performed with Gillota. Etheridge stated Tammie has done nothing with Gillota and that she was just the wife of the lessee (NEWSOM).
>
> Cronig asked Etheridge specifically what time frame Tammie performed services for Gillota. Etheridge stated Tammie is the lessee's wife, Tammie is not working for Gillota, and the last time Etheridge saw Tammie was about one year ago when Tammie was in nursing school.
>
> Cronig asked Etheridge if he would be surprised that Tammie earned $22,817.00, during 2007, and $10,912.00, during 2008, from Gillota. Etheridge stated he was surprised that Tammie earned $22,817.00, during 2007, and $10,912.00, during 2008, from Gillota.
>
> Finally, Cronig showed Etheridge a color copy of NEWSOM's driver's license photo. Cronig then asked Etheridge to identify the photo. Etheridge stated the photo was of her (Tammie's) husband. Etheridge then stated he wanted to stop the interview and that this was something between Gillota, the wife (Tammie), and husband (NEWSOM).

(e) As part of the investigation, the special agents obtained copies of the warrants paid to relator as well as copies of the cancelled checks made out to relator's wife, Tammie Newsom, on the Gillota, Inc. account.

{¶ 18} 5. On March 18, 2011, Drew A. Smith, assistant attorney general, sent a letter to Mr. Steven Yoo, attorney for Gillota, stating:

As we have discussed, the goal of this office, Special Agent Adam Cronig and the Ohio Bureau of Workers' Compensation is to receive a complete and truthful statement from [Gillota], as to his knowledge of Michael Newsom's work activity, nature of that work activity and the nature and amount of payment Mr. Newsom received for his work for Mr. Gillota or Mr. Gillota company.

In pursuit of this goal, and to avoid requiring Mr. Gillota['s] appearance before a Grand Jury, we are requesting that Mr. Gillota supply us with a sworn affidavit addressing these issues. Please find attached a list of questions and issues that we are requesting that Mr. Gillota address in the affidavit.

{¶ 19} 6. Gillota provided, under oath, an affidavit dated April 16, 2011, stating:

[One] From December 2006 through present, what work has Michael Newsom completed for Mr. Gillota or his company?

Answer: No work completed for Mr. Gillota. Causal labor for the Company, including maintenance at 300 Central Viaduct and directing the parking of cars during events.

[Two] From December 2006 through present, what work has Tammie Newsom completed for Mr. Gillota or his company?

Answer: No work completed for Mr. Gillota. No known work completed for the Company since Dec. 2006.

[Three] Why were checks written to Tammie Newsom?

Answer: Because of pending civil litigation against Mr. Newsom filed in Oct. 2006 arising from a shooting incident, the work was brokered through his wife.

[Four] Were some, any or all of the checks written to Tammie Newsom for the work performed by Michael Newsom for John Gillota or his company?

Answer: Yes.

[Five] How much and how did Michael Newsom get paid for his work?

Answer: Any amounts paid for Mr. Newsom's work were reported on 1099s issued to Mrs. Newsom; Mr. Gillota does not know how much Mr. Newsom received from Mrs. Newsom.

[Six] From December 2006 through present, provide specific days, dates and hours per day that Michael Newsom worked for Mr. Gillota or his company.

Answer: Unknown.

[Seven] What records are available to show the specific work dates?

Answer: None.

[Eight] Provide the names of other people that were present during the times when Michael Newsom worked from December 2006 through present for John Gillota or his company.

Answer: The only person Mr. Gillota knows for sure would have seen Mr. Newsom working is Mr. Gillota.

[Nine] What type of lifting was involved with Michael Newsom's job?

Answer: Mr. Newsom performed light duty repair work, which did not require much lifting to Mr. Gillota's knowledge.

{¶ 20} 7. On January 5, 2012, the BWC filed a motion asking the commission to exercise its continuing jurisdiction, terminate relator's TTD compensation as of December 26, 2006, find that he had been overpaid TTD compensation, and further asking the commission to make a finding of fraud. The BWC's motion was supported by the report of the investigators, as well as cancelled checks, bank statements, invoices, affidavits and other statements made which circumstantially indicate that relator had been employed during the time in question working on trucks, performing casual labor including maintenance and directing the parking of cars during events.

{¶ 21} 8. In response, relator's wife, Tammie A. Newsom, signed a letter (not notarized) dated February 15, 2012, stating:

This letter is to inform you and all parties involved that I have been a Contracted Liaison for Gillota Inc.
300 Central Viaduct
Cleveland, Ohio 44115

All checks have been written in my name as a contracted liaison with Marathon Gas Station, Gas Rebate Checks, Oil

Rebate Checks, Labor, Deposits, Profits, etc. I ran the Marathon Gas Station along with my husband's deceased brother Bill Newsome [sic], but I was in charge. I reported daily to Gillota Inc. I am the person whom took care of all deposits for Gillota Inc. I am the person whom delivered daily deposit slips and/or cash money to Gillota Inc.

{¶ 22} 9. Because Gillota had submitted an affidavit containing contradicting statements which he made to the special agents in 2009, counsel for relator asked that Gillota be subpoenaed to testify at the upcoming hearing before the district hearing officer ("DHO").

{¶ 23} 10. A subpoena was issued; however, Gillota did not appear.

{¶ 24} 11. The hearing before the DHO was conducted on June 19, 2012. As above indicated, Gillota did not appear for the hearing. Likewise, neither relator nor his wife appeared for the hearing. The only testimony offered was from Agent Cronig. Counsel for relator's primary argument was that the commission should not consider the April 16, 2011 affidavit of Gillota because the statements made in the affidavit contradicted the statements Gillota made to the special agents when they first interviewed him. Further, counsel argued that, inasmuch as Gillota did not comply with the subpoena and did not attend the hearing, relator was deprived of his right to confront adverse witnesses.

{¶ 25} In response to counsel for relator's argument, counsel for the BWC argued:

> [Ms. Evanick:] [W]e're talking about [Gillota], and that's the person that Mr. Cronig interviewed.
>
> What you have from him is an interview December 22nd of 2008. That's attachment one. That interview took place at Gillota Fuel Products, at the Central Viaduct, which was his business address. He was asked whether or not he knew [Newsom]. He said he did because he leased a Marathon Gas Station at East 152nd and St. Clair.
>
> Now, just a little bit of background about that gas station. All over the claim file there's evidence that he ran that gas station. We don't have any dispute about his activity at that gas station. As far as we know and from every -- the evidence that we have, that gas station ceased operating and he ceased -- or at least he ceased doing any activity there in 2005. We're not talking about any activity with respect to that Marathon Gas Station. The activity that we're talking about is work that he performed for the Gillota Company doing maintenance and directing cars.

So at any rate, Mr. Gillota noted that Mr. [Newsom] leased a Marathon Gas Station at East 152nd. That's how he knew him. He said he never employed Mr. [Newsom]. The interview had to terminate then because the sprinkler system busted, everybody left. They came back either January 12th or January 16, and they began the interview, and it was at that interview that the two attorneys, Mr. Rodio and Steve Yoo, were present. That's contained in attachment five.

And the crux of that interview, Mr. Gillota stated several times that [Newsom] didn't work for him. They asked if the checks were written in someone else's name for work performed by [Newsom], and at that point in time Mr. Rodio instructed Mr. Gillota not to answer. A private discussion ensued. Mr. Gillota came back and the answer was that Mr. [Newsom] was not an employee.

I think the key portion of that interview is that Mr. Gillota said for the business, the Gillota business, Tammy didn't do anything. Tammy was a 1099 person and furnished the labor. She was a contractor. And then if you look, I think it's on the second page, I think, again, a key portion of that interview, it says where else did [Newsom] work besides Gillota. Other than working for Tammy during the last two or three years, he is not aware of any other employment of [Newsom].

So then you jump forward and you have this notarized affidavit that was performed -- or that was obtained and sent to us by Steven Yoo. That's dated on 4-16 of 2011, and that's attachment ten. And I think if you look at that, it ties the whole picture together. The affidavit covers a period from December of 2006 to the present. And what Mr. Gillota says is that Mr. [Newsom] did casual labor for the company, including maintenance at 300 Central Viaduct, in directing of parking of cars during events. Tammy [Newsom] -- again, consistent with the previous statement that he gave.

Tammy [Newsom] did no work for Mr. Gillota and no known work for the company since December of 2006. Checks were written to Tammy for work that was done by Michael because there was a pending civil litigation against Mr. [Newsom], so the work was brokered through his wife. Mr. [Newsom] performed light duty repair work.

In addition to the interviews with Mr. Gillota, there's an interview with Charles Etheridge on 6-16 of 2009. Mr.

Etheridge is the full-time sales manager with Gillota. He's been there since 1993. The only way he knew Tammy [Newsom] was from her husband leasing the gas station at 152nd and St. Clair.

He said Tammy had nothing to do with Gillota. She was just the wife of [Newsom]. Tammy is not working for Gillota. The last time he saw her was about a year ago. That would have been taking it back to '08, which is during -- and before the overpayment, the end of the overpayment period. Saw her a year ago when she was in nursing school.

Mr. Cronig then asked Michael [Newsom] -- or Mr. Cronig asked Mr. Etheridge about Michael [Newsom], and it was at that point that Mr. Etheridge terminated the interview and said, you know what, this is not -- I'm not going to talk about this, this is something between Gillota, Tammy, and [Newsom].

So what we have is -- the evidence is all consistent that Tammy did no work for Gillota. Gillota's original interview says that, Gillota signed a notarized statement that says that, Charles Etheridge's statement says that.

What we do have are checks that are written to Tammy. And if they weren't for work she did, then what were they for? And I would submit to you that they're payment for work that was done by Michael [Newsom], and, again, I think that Mr. Gillota's interview supports that.

Now, Mr. Elzeer, and I think he basically said this in his opening statement, he said Mr. Gillota's flip-flopping in his statements originally saying, well, Mr. [Newsom] didn't work for him, and then he's saying that he did. But I think if you read the documents carefully, they're very consistent. Mr. Gillota said originally that he didn't work for the company, that he wasn't an employee of Gillota. He said that [Newsom] worked for Tammy and that he was casual labor.

So I think if you look at it with the -- through the lens of, okay, well, Mr. Gillota was believing that there wasn't a direct relationship between himself and Mr. [Newsom], Tammy was the one brokering the work. I think if you read, again, the statements, they are consistent. He wasn't an employee of Gillota, he was an employee of Tammy, and his first interview says as much. He says the only work he did was for Tammy during the period in question.

So I think if you, again, look at them closely, it doesn't matter whether you call him an employee, an independent contractor, a brokered worker, casual worker, at the end of the day what we have is uncontroverted evidence that Tammy wasn't doing the work. We have multiple checks that were written to Tammy, and we have a statement -- two statements from Mr. Gillota that can be read consistently that he wasn't an employee of Gillota but he was working for Tammy, and I think that that's certainly sufficient evidence of an overpayment of -- based on work that's being performed in exchange for pay.

(Tr. 13-18.)

{¶ 26} 12. The DHO concluded that the BWC established an overpayment and that fraud was committed in the inducement of the payments for the

The District Hearing Officer finds that the evidence in the claim establishes that during the time in question, Mr. Newsom worked on trucks and performed casual labor including maintenance and directed the parking of cars during events.

The evidence is in the form of statements and affidavits secured from Carol Rollo and [Gillota]. These establish that Mr. Newsom performed the work as stated. While the initial statements secured from [Gillota] indicated that Mr. Newsom did not work for him or his company, he concluded his last interview with Agent Cronig by indicating that he was looking for his file regarding the matter and that additional information might be forthcoming. Additional information in the form of a sworn statement dated 4/16/2011 was secured which indicated that Mr. Newsom performed the work in question.

It is noted that Mr. Newsom failed to attend today's hearing to offer any testimony on the Administrator's motion.

Many times in claims where fraud is being alleged there is clear evidence establishing that the person in question is working. This evidence takes the form of video evidence, testimony or statements secured from parties that have observed the person working, and other evidence establishing payment for services rendered. Such is not the case in this file.

In this claim we have statements from [Gillota], and from Ms. Rollo, both of which indicate that Mr. Newsom worked

during the period in question. There is also evidence that Mr. Newsom's then wife, Tammie, was paid significant amounts of money during the period in question and [Gillota] indicates in his affidavit that some of this money was for the work performed by Mr. Newsom.

As to the issue of fraud the District Hearing Officer must address the prima facie elements which are: 1) a representation, or where there is a duty to disclose, a concealment of fact; 2) which is material to the transaction at hand; 3) made falsely, with the knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) with the intent of misleading another into relying on it; 5) justifiable reliance upon the representation or concealment; and 6) a resulting injury proximately caused by the reliance.

The District Hearing Officer finds that the first element of fraud has been proven. Mr. Newsom had a duty to disclose that he was working during the periods in question and he did not. The evidence establishes that he submitted numerous C-84 forms on which he answered "No" when asked if he had worked in any capacity (emphasis added). The evidence further establishes that he was being disabled on the basis of his allowed physical conditions and it must be presumed that as his physicians completed C-84 forms on his behalf, that he concealed his employment from the doctor/s.

The District Hearing Officer finds that the second and third elements of fraud have been proven. The evidence contained in the report of the Special Investigation Unit of the Bureau establishes that Mr. Newsom executed C-84s under the warning language which advised that the recipient knows that he/she is not entitled to work while receiving temporary total disability compensation. Clearly, the breach of his duty to disclose the fact that he was working along with his concealment of this fact from his physician was material to the execution and completion of the C-84s and the payments made to Mr. Newsom by the Administrator.

The District Hearing Officer finds that the fourth element of fraud has been proven. As stated above, Mr. Newsom executed the C-84s which were submitted to the Administrator and he accepted the benefits generated by these C-84s. The Administrator would not have paid the benefits had he disclosed the fact that he was working and

the concealment of this fact is found to have been done to induce the Administrator into paying the benefits.

The District Hearing Officer finds that the fifth and sixth elements of fraud have been proven. The Administrator justifiably relied upon the C[-]84s submitted on behalf of Mr. Newsom in making the payment of benefits. The Administrator specifically relied on the statements of Mr. Newsom that he was not working and his signature above the warning language on the C-84s to make payments from the state insurance fund. Had he informed the Administrator or any of its agents that he was working the payments would not have been made. Therefore, the overpayment of these benefits was the direct result of Mr. Newsom's misrepresentations.

Accordingly, the District Hearing Officer finds that based upon the evidence on file and presented at hearing, the Administrator has met its burden of proving that Mr. Newsom committed fraud regarding his receipt of temporary total disability over the periods set forth above. Consequently, an overpayment exists in this matter which should be recouped by the Administrator according to O.R.C. 4123.511 (K).

{¶ 27} 13. Relator appealed and again requested that Gillota be subpoenaed to testify before the staff hearing officer ("SHO").

{¶ 28} 14. A subpoena was issued to compel Gillota to appear and testify. However, Gillota did not attend the August 10, 2012 hearing before the SHO. Further, as before, relator likewise did not attend the hearing before the SHO and the only testimony was from Special Agent Cronig. Counsel for relator again argued that the Gillota affidavit should not be considered.

{¶ 29} 15. The SHO vacated the prior DHO order and denied the BWC's motion, stating:

This Staff Hearing Officer finds that the Bureau of Workers' Compensation has not met their burden of proving fraud or that the Injured Worker was working while receiving temporary total disability benefits at this time.

This Staff Hearing Officer finds insufficient evidence to establish that the Injured Worker was actually working during any of these periods of time. The initial investigation evidence clearly indicates a denial of that fact by all parties involved, with what appears to be some prevarication. It is

only the affidavit of [Gillota], dated 04/16/2011, that indicates the Injured Worker was performing any activities for them. The affidavit does not indicate the days the Injured Worker worked, the hours that he worked or the amounts that he was paid. They refer to 1099's submitted to the Injured Worker's wife as a Contractor. The Staff Hearing Officer finds that this affidavit is a contradiction of most of the prior interviews and testimony in this claim.

The Staff Hearing Officer finds the Bureau of Workers' Compensation simply has not submitted sufficient evidence that the Injured Worker was performing work activities while receiving temporary total disability compensation.

{¶ 30} 16. The BWC appealed and, again, Gillota was subpoenaed to testify.

{¶ 31} 17. According to the evidence submitted, the certified mail was signed for by Carol Rollo.

{¶ 32} 18. Again, Gillota did not appear for the hearing before the commission. At this time, the commission granted a continuance to again subpoena Gillota.

{¶ 33} 19. A new subpoena was issued to compel Gillota to testify; however, Gillota did not attend.

{¶ 34} 20. Instead of appearing, counsel for Gillota, Steven R. Yoo, submitted a letter dated December 28, 2012, stating:

Please be advised that [Gillota] has retained Frantz Ward LLP in connection with the attached subpoena. For the reasons set forth below, Mr. Gillota will not attend the hearing scheduled for January 10, 2013, at 1:00 p.m. in Room #1.

First and foremost, [Gillota] has either met with or assisted the BWC and the Ohio Attorney General's office on at least three (3) occasions, at his expense dating back to 2008.

Second, [Gillota] has already searched his records for any available documentation and has already turned over those documents to the BWC.

Third, [Gillota] already provided a signed Affidavit to the AG's office on April 13, 2011 (see attached). More importantly, this Affidavit was a direct response to specific questions drafted by Drew Smith, Assistant Attorney General (see attached). Any alleged information or statements set forth in either Mr. Cronig's notes or his reports that are inconsistent with the Affidavit cannot and should not be

> considered, since they were not statements of [Gillota] and certainly not under oath. The affidavit speaks for itself, and [Gillota] has no further recollections and cannot offer any further information.
>
> For the reasons set forth above, [Gillota] will not attend the hearing. It is unnecessary, unduly burdensome and not likely to lead to any future information.

(Emphasis sic.)

{¶ 35} 21. As before, the only witness who testified was Special Agent Cronig. Neither relator nor his wife appeared and relator's counsel again made the same arguments asserting that Gillota's affidavit should not be considered.

{¶ 36} 22. Following the January 10, 2013 hearing, the commission vacated the SHO's order and granted the motion of the BWC to find an overpayment of TTD compensation and fraud, stating:

> Temporary total disability compensation is found overpaid from 12/26/2006 to 11/21/2008 based on the Injured Worker fraudulently withholding from the BWC his return to work for this period. The overpayment is ordered recouped consistent with R.C. 4123.511 (K) (4).
>
> The Commission finds the Injured Worker performed work for [Gillota] consisting of casual labor, maintenance, light duty repair work, and directing and parking cars. This finding is based upon the affidavit from [Gillota], dated 04/16/2011, and is buttressed by the proof of payment to Tammie Newsom, the Injured Worker's spouse at the time.
>
> The prima facie elements of fraud include: 1) a representation, or where there is a duty to disclose, a concealment of fact; 2) which is material to the transaction at hand; 3) made falsely, with the knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) with the intent of misleading another into relying on it; 5) justifiable reliance upon the representation or concealment; and 6) a resulting injury proximately caused by the reliance.
>
> The Injured Worker had a duty to disclose his employment. The Injured Worker signed seven C-84, Request for Temporary Total, forms, 23 BWC warrants, received accompanying payment remittances, and completed two ACT Enrollment and Direct Deposit Authorization forms.

The forms, warrants, and remittances all warned the Injured Worker that he was not entitled to collect temporary total disability compensation while working. These warnings established the Injured Worker's duty to disclose a return to work and the Injured Worker's utter disregard for such. The Injured Worker's failure to notify his attorney, physicians, the BWC, or the Managed Care Organization was material as it resulted in the payment of temporary total disability compensation to which the Injured Worker was not entitled.

The affidavit from Mr. Gillota, dated 04/16/2011, explains that the Injured Worker performed work and remuneration was made payable to the Injured Worker's spouse, Tammie Newsom. There is no evidence that Tammie Newsom performed any of the work. This evidence, therefore, supports the conclusion the Injured Worker intended to mislead the BWC in order to receive temporary total disability compensation while working. The BWC justifiably relied upon the Injured Worker's false representations since they had no basis, at the time, to suspect the Injured Worker was working. The BWC's reliance, however, led to the payment of compensation, from 12/26/2006 to 11/21/2008, which the Injured Worker was not entitled to receive.

Accordingly, the Injured Worker was overpaid temporary total disability compensation from 12/26/2006 to 11/21/2008 and the overpayment shall be recouped consistent with the fraud provision of R.C. 4123.511 (K) (4).

{¶ 37} 23. Thereafter, relator filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 38} For the reasons that follow, it is the magistrate's decision that this court should deny relator's request for a writ of mandamus.

{¶ 39} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry*

*Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 40} TTD benefits are intended to compensate an injured worker for the loss of earnings sustained while their work injury heals. *State ex rel. Ashcraft v. Indus. Comm.*, 34 Ohio St.3d 42 (1987) and *State ex rel. Parma Community Gen. Hosp. v. Jankowski*, 95 Ohio St.3d 340, 2002-Ohio-2336. Accordingly, temporary TTD benefits cease when a claimant has returned to work. *Id.*

{¶ 41} In *State ex rel. Ford Motor Co. v. Indus. Comm.*, 98 Ohio St.3d 20, 2002-Ohio-7038, the Supreme Court of Ohio held that R.C. 4123.56(A) prohibits the receipt of TTD compensation while engaging in any type of work. *State ex rel. Johnson v. Rawac Plating Co.*, 61 Ohio St.3d 599 (1991), holds that the claimant does not have a right to engage in gainful employment while receiving TTD compensation. Further, in *State ex rel. Blabac v. Indus. Comm.*, 87 Ohio St.3d 113 (1999), the court held that any return to work, including part-time work, precludes the payment of TTD compensation.

{¶ 42} The commission argues that the BWC presented sufficient evidence to establish a prima facie case that relator worked and received remuneration for work activities while receiving TTD compensation. In finding that the BWC did present a prima facie case, the commission relied exclusively on the April 16, 2011 affidavit of Gillota indicating that, from December 2006 relator performed casual labor, including maintenance and directing the parking of cars during events, for Gillota's company. Gillota was not able to provide any specific dates when relator was working. Gillota also indicated that any amounts which his company paid for relator's work were actually reported on 1099s issued to his wife.

{¶ 43} Questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *Teece.* Further, it is immaterial whether other evidence, even if greater in quality and/or quantity, supports a decision contrary to the commission's. *State ex rel. Pass v. C.S.T. Extraction Co.*, 74 Ohio St.3d 373 (1996).

{¶ 44} Relator's entire argument focuses on his contention that the commission violated his due process right to cross-examine Gillota when he refused to honor the subpoena and appear for the hearing. According to relator, when Gillota refused to

appear for the hearing, the commission should have rejected his 2011 affidavit. Once that crucial piece of evidence upon which the commission ultimately relied to find that he had been working while receiving TTD compensation and he had committed fraud is removed from consideration, relator contends that there is no evidence in the record that would support a finding that he was working or that he committed fraud.

{¶ 45} The magistrate finds that it is not necessary to consider relator's due process argument because relator failed to avail himself of the opportunity to ask the commission to take further action to compel Gillota's attendance.

{¶ 46} R.C. 4123.08 provides:

**Powers of officers in administrative proceedings**

**Each member of the industrial commission, and its deputies, supervisors, directors, and secretaries, appointed by the commission,** and employees of the bureau of workers' compensation designated by the administrator of workers' compensation, **may** for the purposes contemplated by this chapter, administer oaths, certify to official acts, take testimony or depositions, conduct hearings, inquiries, and investigations, **issue subpoenas, and compel the attendance of witnesses** and the production of books, accounts, papers, records, documents, evidence, and testimony.

(Emphasis added.)

{¶ 47} Further, R.C. 4123.12 provides:

**Attachment proceeding to compel obedience**

In case any person fails to comply with an order of the industrial commission or subpoena issued by the commission or its secretary or the bureau of workers' compensation, or any of their inspectors, or examiners, or on the **refusal of a witness to testify to any matter regarding which he may be lawfully interrogated,** or if any person refuses to permit an inspection, **the probate judge of the county in which the person resides, on application of any member of the commission or its secretary or the bureau, or any inspector, or examiner appointed by the bureau, shall compel obedience by attachment proceedings as for contempt, as in the case of disobedience of the**

> **requirements of subpoena issued from such court**
> **on a refusal to testify therein.**

(Emphasis added.)

{¶ 48} Counsel for relator knew that Gillota's testimony was crucial and, for that reason, specifically asked the commission to subpoena him. In fact, Gillota was subpoenaed several times; however, Gillota never appeared to testify. Instead, by letter dated December 28, 2012, Gillota's attorney informed the commission that Gillota would not attend the hearing.

{¶ 49} When Gillota refused to attend the hearing, relator's counsel could have, but did not, ask the commission to institute contempt proceedings with the probate judge of the county in which Gillota resides. Counsel could have taken this step; however, counsel did not. A writ of mandamus is not appropriate when the requesting party has not availed himself of other available legal remedies. Instead, counsel wants this court to remove Gillota's affidavit from evidentiary consideration and order the commission to vacate its order. It is this magistrate's opinion that this court should not take that step.

{¶ 50} Finding that the commission did not abuse its discretion when it considered Gillota's affidavit, the question remains whether that affidavit constituted some evidence that relator was working while receiving TTD compensation and whether or not that affidavit and the checks written to relator's wife constitute some evidence of fraud.

{¶ 51} It is undisputed that an injured worker is prohibited from receiving TTD compensation while engaging in any type of gainful employment. *See Ford Motor Co.*; *Johnson;* and *Blabac*.

{¶ 52} In the present case, although relator was never observed working, Gillota's affidavit does constitute some evidence that relator was working during the relevant time period. Further, the affidavit of Gillota supports the finding that relator was paid for his work—specifically, checks were written to his wife for his work. As Gillota's affidavit indicates, relator's wife did not perform any work.

{¶ 53} Having found that there was some evidence in the record to support the commission's determination that relator was working and that he was overpaid TTD compensation, the question to be addressed next concerns whether or not there was some evidence in the record to support the commission's determination that relator committed fraud.

{¶ 54} The elements of fraud are:  (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance.  *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54 (1987).

{¶ 55} In the present case, relator was required to notify the commission if he returned to any work.  The fact that he was working and that his wife was being paid for his work was material.  Further, the fact that relator's wife received the money instead of him demonstrates that relator understood the nature of his actions, knew those actions were wrong, and had the intent to mislead the commission into continuing to pay him TTD compensation.  Relator did receive TTD compensation during a period of time when he was working demonstrating that the commission justifiably relied upon his representation and his concealment and was injured.

{¶ 56} The Gillota affidavit and the money paid to relator's wife constitutes some evidence supporting the commission's determination that relator was working and being paid to work while receiving TTD compensation and supports the commission's order.  As such, the magistrate finds that the commission did not abuse its discretion and this court should deny relator's request for a writ of mandamus.

/S/MAGISTRATE
STEPHANIE BISCA BROOKS

**NOTICE TO THE PARTIES**
Civ.R.  53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).